**UNITED STATES of America ex rel. Melvin H. SULLIVAN, Petitioner,**

v.

**James A. FAIRMAN and Attorney General of Illinois, Respondents.**

No. 82C613.

United States District Court, N.D. Illinois, E.D.

April 28, 1983.

Martha A. Mills, Sue A. Herrmann, Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen. of Ill., Kenneth A. Fedinets, Asst. Atty. Gen., Chicago, Ill., for respondents.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Melvin H. Sullivan ("Sullivan") has brought this 28 U.S.C. § 2254 ("Section 2254") habeas corpus proceeding against Pontiac Correctional Center Warden James A. Fairman and the Attorney General of Illinois. Respondents now move to dismiss Sullivan's amended habeas corpus petition. For the reasons stated in this memorandum opinion and order, respondents' motion is granted.

### Background

Sullivan was charged with the murder of Michael Grayson ("Grayson"), who was fatally shot at 2:30 a.m. March 18, 1979, in front of the Pepperbox Lounge (the "Pepperbox") in Chicago. At the bench trial the State's principal witness was Elnora Barnes ("Barnes"), a prostitute who had spent most evenings during the two weeks preceding the slaying with Sullivan at the Westlane Hotel. Barnes's version of events directly implicated Sullivan in the crime:

Late in the evening of March 17 Barnes went to the Pepperbox to find Sullivan. When she arrived she saw Sullivan and Grayson talking and drinking together. Sullivan (who had red hair and a beard) was wearing a long, grey coat. At some point she also noticed Sullivan still had the gun she had seen him hide in his pants that morning.

Some time after 1 a.m. Barnes left the tavern with Sullivan, Grayson and two other individuals named Cynthia and Cary. Outside the bar Sullivan confided to Barnes his plans to rob Grayson. As Barnes then crossed the street she heard a shot. Turning around, she saw Grayson collapse near Sullivan and Cary. Barnes then ran to her hotel room. When Sullivan arrived there about 30 minutes later, Barnes asked him what was wrong. Sullivan responded, "I just killed a nigger" at the corner. (Report of Proceedings ("R.") 57).

To buttress Barnes's account the State called two other witnesses, Pepperbox employee Sam Titus ("Titus") and Pepperbox patron Willie Davis ("Davis"). Titus testified he saw Sullivan at the lounge that night. However, he also acknowledged he neither witnessed the actual shooting nor recalled when Sullivan arrived or left the bar. Davis' testimony was more incriminating. Just before the killing occurred, Davis went outside the Pepperbox for some fresh air. At that time he heard the shot and saw two women running away. Davis also saw a person in a long grey coat fleeing the scene, but he could not identify that individual's sex. Davis recalled seeing Sullivan in the Pepperbox both after midnight and earlier in the evening.

Sullivan called three witnesses to establish an alibi defense: Sullivan himself, his aunt Kathleen Sullivan and his cousin Linda Lee Sullivan. Sullivan testified he left the Pepperbox by himself shortly before midnight. He walked two blocks to his aunt's home, where he was living, and rang the doorbell. His aunt looked out the upstairs window, saw Sullivan at the front steps and tossed him the door key. Sullivan then opened the door and went to bed. Sullivan also testified his intimate relationship with Barnes had degenerated into one of bitter animosity. Though he admitted seeing Barnes the morning of March 18, Sullivan insisted he had not seen her at the Pepperbox that previous evening.

Sullivan's aunt largely corroborated his story. According to her Sullivan came home at 1:00 a.m. on March 18, let himself in the door (after she threw down the key) and went directly to bed. Sullivan's cousin's testimony was of little assistance, for she was sound asleep when Sullivan supposedly came home.

After those defense witnesses testified, Sullivan's appointed counsel moved for a continuance to enable him to interview certain witnesses listed by the State in its discovery response as well as some other unidentified witnesses. That motion was denied. After closing arguments the court found Sullivan guilty and sentenced him to a 20-year term.

After retaining private counsel, Sullivan moved for a new trial on the basis of newly

discovered evidence. That new evidence consisted of affidavits from the five occurrence witnesses identified in the State's response to discovery. In substance each affidavit indicated Sullivan was not the assailant. That motion too was denied, this time because the exculpatory evidence could have been discovered before trial had Sullivan (or more accurately his counsel) been diligent.

Next Sullivan (at that point represented by the state appellate defender) appealed his conviction. Three of the four issues presented for review concerned the five proposed witnesses:

1. whether the trial court erred in denying the post-trial motion without at least convening an evidentiary hearing;

2. whether the trial court erred in denying the motion for continuance; and

3. whether trial counsel's failure to interview those witnesses or secure their presence for trial denied Sullivan effective assistance of counsel, as guaranteed by the Sixth Amendment.[1]

Unpersuaded by any of Sullivan's arguments, the Illinois Appellate Court affirmed his conviction. *People v. Sullivan,* 95 Ill. App.3d 571, 51 Ill.Dec. 60, 420 N.E.2d 474 (1st Dist.1981). Leave to appeal was denied by the Illinois Supreme Court.

Sullivan did not pursue any state remedies under the Illinois Post-Conviction Act (the "Act"), Ill.Rev.Stat. ch. 38, §§ 122–1 to 122–7. Instead he instituted this habeas corpus proceeding pro se. This Court obtained appointed counsel to represent him.

### Motion To Dismiss

Counsel filed an amended petition to refine Sullivan's claims, asserting:

1. Two trial court actions infringed Sullivan's due process rights: denial of the motion for new trial without holding an evidentiary hearing, and denial of the motion for continuance.

2. Trial counsel's failure to interview and call the five occurrence witnesses violated Sullivan's Sixth Amendment right to counsel.

Defendants advance three grounds for dismissal:

1. Because both claims could be presented in a state post-conviction proceeding, Sullivan has not exhausted available state remedies, as required by Section 2254(b).

2. Sullivan's failure to raise his due process claims on direct appeal was a procedural default that bars habeas review under the cause-prejudice standard of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

3. Trial counsel's inaction did not impair Sullivan's Sixth Amendment rights.

These contentions will be examined in turn.

### 1. *Exhaustion of State Remedies*

■ Defendants' exhaustion argument is untenable. True enough, Sullivan could *file* a post-conviction petition under the Act, which confers standing on "[a]ny person imprisoned in the penitentiary who asserts that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States." Ill.Rev.Stat. ch. 38, § 122–1. But Illinois doctrines of res judicata and waiver would preclude post-conviction review of either habeas claim on the merits. *People v. James,* 46 Ill.2d 71, 263 N.E.2d 5 (1970) held those concepts foreclosed consideration of any issues that were or could have been presented on direct appeal from a conviction. And it is well settled in this Circuit that "a petition for a writ of habeas corpus should be dismissed for failure to exhaust this [post-conviction] remedy 'only if there is direct precedent indicating that under the particular circumstances of a prisoner's case the waiver [and res judicata] doctrine[s] will be relaxed.'" *Perry v. Fairman,* 702 F.2d 119, 121 (7th Cir.1983), quot-

---

**1.** In accordance with customary (though technically imprecise) practice, this opinion will refer to the underlying Bill of Rights provision rather than the Fourteenth Amendment, which restricts state action and has been held to incorporate the Bill of Rights guaranties for that purpose.

ing *United States ex rel. Williams v. Brantley,* 502 F.2d 1383, 1386 (7th Cir.1974) (first bracket added; second and third brackets in original).

Here res judicata and waiver squarely apply:

1. Sullivan's ineffective assistance claim was considered and rejected by the Illinois Appellate Court, bringing res judicata considerations into play.

2. Sullivan's due process claim implicates waiver notions, for it could have been but was not mentioned on direct appeal.[2] *See infra* at 578–579.

Moreover there is no "direct precedent" suggesting an Illinois court would ignore those threshold obstacles if Sullivan sought post-conviction relief:

1. Illinois' "non-record evidence" exception to the waiver and res judicata doctrines is unavailing, for both habeas claims rely exclusively on evidence contained in the appellate record. *See United States ex rel. Williams v. Israel,* 556 F.2d 865, 866 (7th Cir.1977) (claims "based in substantial part on evidence outside the record" are not waived for purposes of the Act). Sullivan's current Sixth Amendment claim is coextensive in factual terms with the ineffective counsel contentions previously raised on direct appeal. As for Sullivan's due process claim, that draws on the same factual matrix that bounded two other arguments posed to the Illinois Appellate Court—that the trial court abused its discretion in denying Sullivan's motions for a new trial and a continuance.

2. Illinois' "fundamental fairness" exception to the waiver rule is deemed inapposite, for none of the handful of cases invoking that concept involve circumstances "substantially the same as" Sullivan's situation. *See Brantley,* 502 F.2d at 1386.

Accordingly Sullivan has exhausted all available state remedies as to both habeas claims.

### 2. Applicability of Wainwright v. Sykes

Exhaustion only begins, rather than ends, the inquiry. Under *Wainwright's* "waiver" doctrine, a state prisoner who fails to comply with state procedural requirements for judicial review of an issue cannot assert that issue in a federal habeas proceeding unless he demonstrates just cause for and prejudice from his procedural lapse.

■ That waiver concept is fatal to Sullivan's due process count. In his motions for a new trial and continuance and his appeal from the denial of those motions, Sullivan never advanced a due process (or any other federal constitutional) justification, relying solely on state law.[3] That omission frustrates the comity notions that underlie the waiver doctrine (as well as the statutory exhaustion requirement), for the trial and appellate courts were deprived of a meaningful opportunity to cure any constitutional infirmity in Sullivan's trial. State courts cannot be expected to divine latent federal constitutional issues lurking within the factual foundations of asserted state law claims. *Cf. Klein v. Harris,* 667 F.2d 274, 282 (2d Cir.1981) (for exhaustion purposes, "petitioner must have made the same factual complaint to the state court ... [and] his state court brief must have contained words, such as 'under the due process clause' or 'under the Constitution,' that expressly spell out the petitioner's reliance on the United States Constitution as his legal basis for relief"); *Wilson v. Fogg,* 571 F.2d 91, 92 (3d Cir.1978) ("Where a petitioner has raised his claim in the state court solely as a violation of state statutes and not on the basis of an invasion of his federal constitutional rights, dismissal by the federal court

---

**2.** To the extent Illinois' waiver rule regards that due process claim as having been implicitly raised on direct appeal (because it was embodied in state law claims actually urged before the Appellate Court), res judicata would thwart post-conviction review.

**3.** Specifically Sullivan contended the trial court's disposition of those motions was an abuse of discretion because the evidence established his due diligence in discovering and procuring the five witnesses.

is mandated" under the exhaustion doctrine).[4]

By failing to present his due process claims to any state court, Sullivan has forfeited habeas review unless *Wainwright*'s conjunctive requirements of cause and prejudice are met. *See also United States ex rel. Spurlark v. Wolff,* 699 F.2d 354, 357–61 (7th Cir.1983) (extending *Wainwright*'s cause-prejudice standard to failure-to-appeal cases). Sullivan has not even attempted to satisfy either branch of *Wainwright.* Accordingly Sullivan's procedural default bars this Court from assessing his due process claim.

### 3. *Sixth Amendment Rights*

■ Sullivan also fails on his ineffectiveness of counsel count. To prevail on that claim, Sullivan must prove the overall performance of trial counsel Mark Lieberman ("Lieberman") (1) fell short of "minimum professional standards" and (2) prejudiced the outcome of the trial. *Wade v. Franzen,* 678 F.2d 56, 58–59 (7th Cir.1982).

*Guzzardo v. Bengston,* 643 F.2d 1300, 1305 (7th Cir.1981) spells out the constitutional test:

> A minimum standard of professional representation does not mean representation free of questionable tactical decisions or even what hindsight might suggest were mistakes. It means representation without serious prejudicial blunders which have foreseeable adverse consequences.

Seizing on *Wade*'s admonition that "the lawyer's handling of the defense be evaluated *as a whole*" (678 F.2d at 58, emphasis added), defendants claim whatever blunder Lieberman committed by failing to interview and call the five witnesses was "redeemed" by his otherwise flawless performance. Some of their observations are well-taken, for the trial transcript confirms:

1. Lieberman effectively developed Sullivan's alibi defense.

2. Lieberman performed commendably during opening and closing arguments and in cross-examining prosecution witnesses.

■ On the present record, however, this Court is hesitant to discount the extent to which Lieberman's failure to investigate witnesses infected the calibre of his overall representation. Even a single "blunder [can be] so egregious as to be inconsistent with the observance of minimum professional standards." *Wade,* 678 F.2d at 59. *See also Hawkman v. Parratt,* 661 F.2d 1161, 1168–69 (8th Cir.1981) (to comport with Sixth Amendment standard of competency, counsel must independently interview witnesses before advising defendant to plead guilty); *Hines v. Enomoto,* 658 F.2d 667, 676 (9th Cir.1981) ("failure to interview potential witnesses can constitute ineffective assistance of counsel"); *Wilson v. Cowan,* 578 F.2d 166, 168 (6th Cir.1978) (counsel's failure to call witnesses who could have supported the only defense available rendered his representation constitutionally defective); *United States ex rel. Cosey v. Wolff,* 526 F.Supp. 788, 790–92 (N.D.Ill. 1981) (counsel's failure to produce a single witness when at least five were known to be available offended minimum professional standards), *rev'd on other grounds,* 682 F.2d 691 (7th Cir.1982). And as Sullivan points out, the record (viewed in the light most favorable to him) contains enough evidence to create an inference that Lieberman's oversight rendered constitutional proportions:

1. In response to discovery requests Lieberman received copies of police reports, attached to which were summaries of statements from various witnesses, including the five witnesses in question— Vernell Davis ("Davis"), Jedda Sullivan, Leroy Johnson ("Johnson"), June Brown

---

**4.** Though expressly dealing with the exhaustion requirement, these pronouncements are directly applicable in the waiver context, for both doctrines really address the same central question, albeit from different temporal perspectives. Exhaustion inquiries ask whether the petitioner has any remaining opportunity to press his constitutional claims in a state forum. Waiver inquiries focus on whether the petitioner defaulted on any prior (and currently unavailable) opportunity to do so.

("Brown") and Arthur Malone ("Malone"). According to their statements, all five had seen the assailant at close range, and at least three of them believed they could make a positive identification.[5] Furthermore the Jedda Sullivan and Davis accounts somewhat conflicted with Barnes's version of events.[6] Finally the March 18 police report (based on the Brown and Malone interviews) described the offender as having a *black* (not red) afro. In short, the investigative materials arguably should have alerted Lieberman as to the exculpatory potential of testimony from the five witnesses.

2. According to the Vernell Davis affidavit, he told Lieberman on or before February 6, 1980 (the date he had been subpoenaed to appear at Sullivan's trial) (a) he had been with Grayson continuously throughout the night of the shooting, (b) neither he nor Grayson went inside the Pepperbox that evening and (c) he was certain Sullivan was not the assailant.[7]

Because all factual issues must be resolved against defendants at this juncture, this Court must presume Lieberman's lapse jeopardized Sullivan's Sixth Amendment rights.

Once again the analysis does not end with that conclusion. This Court must still determine whether any constitutional breach by Lieberman was a harmless error. On that score the Illinois Appellate Court said (95 Ill.App.3d at 575, 51 Ill.Dec. at 63–64, 420 N.E.2d at 477–78):

Defendant's counsel attached five affidavits to his post-trial motion. Two affiants were walking with the deceased when the shooting occurred. Both stated to the police after the shooting that they

did not get a good look at the offender. Hence the weight of their affidavits that defendant was not the offender would have been substantially reduced on cross-examination. Their affidavits also recited that deceased was not in the Pepperbox that night. We do not believe that such a collateral contradiction viewed against the testimony of all the State's witnesses would change the result of the trial in light of the overwhelming evidence against defendant.

The affidavit of Leroy, a/k/a "Candy" Johnson, a male prostitute, stated that he was standing at the corner when the shooting occurred. It also recited that Johnson told police he could identify the assailant if he saw him again and that he attended high school with the assailant. In connection with the motion for a new trial, a photo of defendant was shown to Johnson and he stated that defendant was not the assailant. The affidavits of June Brown and Arthur Malone contain similar assertions. Although such testimony at trial certainly would have been favorable to defendant, it would not dictate a different result. In this regard, we think it highly significant that this was a trial without a jury. The trial court heard the testimony of Elnora Barnes not only as to what she viewed at the shooting but also as to defendant's admissions made to her before and after the killing. The trial court also heard defendant's alibi. The judge observed the demeanor of the witnesses, weighed their credibility, and believed Barnes. Moreover, the same judge considered the affidavits and heard in argument the substance of the affiants' testimony. Defendant premised his post-trial motion on

---

5. None of the witness statements expressly exonerated Sullivan, who was not then a suspect.

6. For example, both witnesses said they were the only ones who had been with Grayson at the time of the shooting.

7. It is true that had Davis been called as a witness, the State could have essayed impeachment by introducing the following entry in one of the police reports (R. 243):

DAVIS, Vernell was shown the photos [one of which apparently was of Sullivan] and he related he is unable to make an identification due to the fact he had only gotten a glimpse of the shooter.

But without the benefit of Lieberman's own explanation for not using Davis as a defense witness, this Court is unwilling to treat that omission as a tactical decision immune from Sixth Amendment scrutiny.

ineffective assistance of counsel as well as on newly discovered evidence. After considering affiants' assertions, the same judge adhered to his ruling and denied the post-trial motion. We believe it is clear that had the trial court heard the testimony of affiants, the outcome would have been the same. Defendant has not shown the requisite prejudice stemming from the absence of affiants' testimony. Thus, the conduct of defendant's appointed counsel did not give rise to reversible error in the present case.

As for the *factual* aspects of that determination, *Sumner v. Mata,* 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981) makes the Appellate Court's holdings dispositive. And as for the *legal* conclusions, this Court is persuaded for the same reasons stated in the extended quotation. It too finds "highly significant" the trial court's adherence to its earlier determination of guilt after considering the affidavits of the five witnesses (and the potential value of observing their demeanor). After all, in that context the trial court's evaluation had effectively erased any impact of Lieberman's blunder.

Under such circumstances, "it still is clear beyond a reasonable doubt that [Sullivan] would have been convicted of [Grayson's] murder." *Wade,* 678 F.2d at 59. Thus the harmless error doctrine requires dismissal of Sullivan's ineffective assistance claim.

### Conclusion

Defendants are entitled to a judgment as a matter of law. This action is dismissed with prejudice.