Augustus MARSHALL,
Petitioner–Appellant,

v.

Warren YOUNG, Superintendent, and Donald J. Hanaway, Attorney General of the State of Wisconsin, Respondents–Appellees.

No. 87–1028.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1987.

Decided Nov. 17, 1987.

Donna L. Hintze, State of Wisconsin, Office of Public Defender, Milwaukee, Wis., for petitioner-appellant.

Michael R. Klos, Asst. Atty. Gen., Wis. Dept. of Justice, Madison, Wis., for respondents-appellees.

Before EASTERBROOK and RIPPLE, Circuit Judges, and GRANT, Senior District Judge.[*]

RIPPLE, Circuit Judge.

Augustus Marshall, a state prisoner, appeals from the denial of his petition for a writ of habeas corpus. Mr. Marshall was convicted of one count of murder and two counts of attempted murder. He claims that he received ineffective assistance of counsel at trial because his trial counsel failed to make an adequate investigation regarding the bullets that remained in the bodies of the attempted murder victims. He also argues that his conviction was obtained through the use of hearsay testimony that violated the confrontation clause of the sixth amendment because it lacked sufficient indicia of reliability, as required by *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). For the reasons set forth in the following opinion, we affirm the order of the district court.

# I

## Facts

### A. *The Shootings*

On October 28, 1979, Ryan Kent Baxter was shot to death during a shootout at Groovy People's International, a Milwaukee after-hours club. Mary Polk and Eddie Young received gunshot wounds. Their treating physicians decided, for medical reasons, to leave the bullets in their bodies. Several eyewitnesses, including Ms. Polk and Mr. Young, testified as to the events surrounding the shootings.

Ms. Polk testified that she and several other people were in the room where the shootings took place. She testified that a

man named Joe Brackins, after having left to investigate a disturbance in another part of the building, ran back into the room shouting "they got guns." Tr. II at 6. According to Ms. Polk, she ran to a corner of the room to hide behind a fan. She heard a conversation between two men and Mr. Baxter; then she heard two shots. She believed that one was louder than the other, as if two different guns were fired. She also testified that, after Mr. Baxter had been shot, Mr. Young stood up over Ms. Polk and began to fire toward the men at the other end of the room. At this point, the men at the other end of the room (Mr. Marshall and Mr. Bruce Jones) returned Mr. Young's fire. She testified that, during this exchange, she and Mr. Young were shot. After being told to throw out his gun, Mr. Young did so. Ms. Polk testified that she was treated for a bullet wound to her stomach, and that a bullet remains lodged in her stomach.

Mr. Young testified that, after he heard shouts about men having guns, Mr. Baxter walked to the bar at the front of the room, and drew his gun and held it behind him. He testified that Mr. Baxter reassured everyone and said, "[i]f they come in there, they is dead now." Tr. II at 58. He then testified that two men with guns entered the room and requested a key. The men told Mr. Baxter that he was dead if he had a gun. Mr. Young further testified that Mr. Baxter struggled with them and that he was eventually spun around and shot once by each of the two men. Mr. Young guessed that the shorter man had a magnum and that the taller one had either a .32 caliber or .38 caliber pistol. He testified that he then fired one shot toward the two men, after which he himself was shot in the leg. He fired his last bullet, and then threw his gun out into the center of the room after being ordered to do so. He also testified that, when he was treated for the gunshot wound, the bullet was not removed.

---

[*] Hon. Robert A. Grant, Senior District Judge, Northern District of Indiana, sitting by designa-      tion.

Another eyewitness was Carolyn Jackson, Mr. Baxter's girlfriend. She testified that she and Mr. Baxter had gone out with a group of people, including Mr. Young and Ms. Polk, on October 27. In the early morning hours of the 28th, they went to the after-hours club and went to a room on the first floor that contained a bar—the room where the shootout occurred. She testified that, at about 8:00 a.m., Mr. Baxter went to the front of the room to the bar. She testified that an old man (Mr. Brackins) ran into the room and hid in a corner by a fan. Mr. Marshall and Mr. Jones then entered the room with guns drawn and stood very close to Mr. Baxter. She testified that Mr. Marshall's gun was bigger than Mr. Jones' gun and that Mr. Marshall's gun had a long barrel. Ms. Jackson testified that two shots were fired, one of which was louder than the other. Mr. Baxter then fell to the floor. She then testified that, after Mr. Baxter fell, Mr. Marshall and Mr. Jones fired shots toward the back of the room and Ms. Polk and Mr. Young were wounded. She testified that Mr. Young had a gun but she was unsure whether he had fired it. After the shootings, Mr. Marshall and Mr. Jones left the room and she heard the sound of breaking glass as they left through a window in the next room.

Joseph Brackins testified that he left the room where the shootings occurred to investigate a disturbance on the second floor. As he was going to the second floor, two men holding guns came down the stairs and told him to return to the room from which he came. Mr. Brackins identified one of these men as Mr. Marshall. He believed that the gun Mr. Marshall held was either a .357 magnum or a .45 caliber pistol. He testified that Mr. Jones' gun was either a .32 or a .38 caliber pistol. Mr. Brackins testified that he hid behind a fan in the back corner of the room. He testified that he saw Mr. Marshall confront Mr. Baxter and then spin Mr. Baxter around and shoot him in the back. He heard a

second shot, not as loud as the first, which he assumed to come from Mr. Jones' gun. He then heard Mr. Marshall and Mr. Jones say "drop it" and then a sound which he assumed to be a gun hitting the floor. Tr. I at 292. This was followed by more gun fire, after which Ms. Polk fell into his lap with a gunshot wound to her stomach.

An additional witness of the events at the club was Adolph Tates.[1] Mr. Tates did not see the shootings. He testified that, prior to the shootings, he was on the second floor of the club and saw Mr. Marshall, Mr. Jones and an unidentified third man surround a man named Sonny Carter and escort him downstairs. They then disappeared from Mr. Tates' view. Mr. Tates testified that all three men had guns drawn. A short time later, Mr. Tates heard gunshots. He proceeded to a porch area on the roof by the front of the building. From there he observed Mr. Marshall, Mr. Jones and the third man jump out of a window on the first floor and leave in a black Cadillac with a Wisconsin license plate. Mr. Tates said that the third man was not Arthur Johnson.

Arthur Johnson testified as to events that occurred before and after the shootout. Mr. Johnson testified that he met Mr. Marshall and Mr. Jones at a disco club on the night before the shooting. He testified that Mr. Jones asked if he and Mr. Marshall might borrow Mr. Johnson's car, a 1974 black Cadillac, for the evening in exchange for $100. Mr. Johnson agreed, and Mr. Jones and Mr. Marshall dropped Mr. Johnson off at his house at about 7:30 that evening.

Mr. Johnson testified that the men returned the car the following morning and that they asked Mr. Johnson to drive them to another location. Mr. Jones and Mr. Marshall were accompanied by a third man whom Mr. Johnson knew only as "Sly". Mr. Johnson drove the men to the home of Elijah Jackson. Mr. Johnson had known Mr. Jackson through prior drug transac-

---

1. The record is unclear about the spelling of Mr. Tates' name. The petitioner's brief refers to him as Mr. Tates. The Wisconsin Supreme Court in its opinion referred to him as Mr. Tate. The trial transcript refers to him as both Mr. Tate and Mr. Tates. Because the petitioner chooses to refer to him as Mr. Tates, we will do likewise.

tions. The four men entered Mr. Jackson's home and Mr. Johnson sat apart from the other four. Mr. Johnson testified that the men talked about a shooting and that Mr. Jackson was apparently angry and told Mr. Marshall that he could not pay him $1,000 because he had not killed Sonny Carter. From the conversation, Mr. Johnson surmised that Mr. Carter apparently had "beat" Mr. Jackson out of some drugs and that Mr. Jackson had hired someone to kill Mr. Carter. In response to Mr. Jackson's remarks that he could not pay Mr. Marshall $1,000 because he had killed the wrong man, Mr. Marshall responded that he had risked his life, that everyone had started shooting and that he had to flee from the building. Mr. Johnson also testified that, based on the conversation, he understood that Mr. Jackson had previously told the other three men that Mr. Carter would be at the club, and that these men were supposed to kill Mr. Carter.

Mr. Marshall testified in his defense. He testified that he and his girlfriend were out with Mr. Jones and Mr. Jones' girlfriend and that they met Arthur Johnson and his wife and sister at approximately 1:30 a.m. The couples took Mr. Johnson's sister home and then rode in Mr. Johnson's car to the after-hours club. Mr. Marshall further testified that, after arriving at the club, the group went to the second floor where Mr. Jones had a conversation with Sonny Carter about buying cocaine. After this, Mr. Marshall, Mr. Jones and Mr. Johnson went to a house to obtain cocaine to sell to Mr. Carter. Mr. Marshall testified that, on this trip, Mr. Jones obtained a .22 caliber pistol and Mr. Johnson stated that he was getting a gun from the trunk of his car.

According to the defendant, when the men returned to the club, Mr. Carter said he would not purchase the cocaine. Mr. Jones pulled out his gun and said he was going to take Mr. Carter outside to beat him up. Mr. Marshall claimed that he had no gun at this time. When the men tried to leave the building they found that the exit on the first floor was locked. Mr. Marshall testified that he followed Mr. Jones into a room so that they could find someone who had a key to the door. Mr. Johnson stayed

with Mr. Carter. Mr. Marshall testified that they entered the room where the shootout occurred to ask for a key. Mr. Marshall testified that Mr. Baxter then charged Mr. Jones with a pistol drawn. He also testified that, at the same time, a woman in a fur coat shot at him with a rifle from behind the bar. Mr. Marshall testified that, as Mr. Jones and Mr. Baxter wrestled, he struck Mr. Baxter and Mr. Baxter dropped his gun, which he then picked up.

Mr. Marshall further testified that several people were firing weapons from the rear of the room. He testified that he fired the gun that he had picked up, a .32 caliber snub-nosed revolver, at a man in the corner who had been firing at him. Mr. Marshall estimated that a total of ten to twelve shots were fired in the room. He testified that he did not intentionally point a gun at Ms. Polk and that he did not intend to kill her or anyone else. He also denied shooting Mr. Baxter or seeing Mr. Jones shoot Mr. Baxter. Mr. Marshall testified that, after the shooting started, Mr. Jones told everyone to drop their guns and that four to five guns were thrown out onto the floor. Mr. Marshall testified that he picked up a .32 automatic and a long-barrelled .22 pistol. He also testified that Mr. Jones had three pistols, but that he did not know what caliber or kind they were. Mr. Marshall stated that no shots were fired after the guns were collected. Mr. Marshall testified that, at this point, he went into the next room and kicked out a window through which he exited. He then met Mr. Johnson at Mr. Johnson's car. Mr. Jones arrived at the car shortly thereafter and the three men left.

Mr. Marshall claimed that the men did not go to Elijah Jackson's house and that he had never discussed killing Mr. Carter with Mr. Jackson. He testified that, after the shootout, he and his companions went to his sister's home and then to his mother's home, so that Mr. Marshall could get some money in the event he would have to leave town.

### B. *Post-trial Motions*

Mr. Marshall was found guilty of one count of first-degree murder and two counts of attempted murder. He then filed a motion for a new trial. Two hearings were held on this motion, the first on July 10, 1981. The only witness at the first hearing was Professor Duane Nicol from the Department of Criminal Justice at the University of Illinois, Chicago Circle Campus. Professor Nicol testified that, in his opinion (based on his review of x-rays of Mr. Young and Ms. Polk), the bullets in the bodies were .22 caliber long rifle bullets. Tr. of July 10, 1981 at 4. Professor Nicol's procedure was based on a comparison of the length of the bullets to the diameter of the bullets. He also testified that the bullets in the bodies of Mr. Young and Ms. Polk were not .25, .32 or .38 caliber bullets.

The second hearing was held on September 16, 1981. The only witness at this hearing was Alan Glasschroeder, Mr. Marshall's trial counsel. Mr. Glasschroeder testified that the defense he had raised to the first degree murder charge was that Mr. Young had shot Mr. Baxter and that Mr. Marshall had acted in self-defense. His defense to the attempted murder charges was similar—that someone other than Mr. Marshall had shot Mr. Young and Ms. Polk and that Mr. Marshall had acted in self-defense. Mr. Glasschroeder testified that he knew that the bullets were in Mr. Young and Ms. Polk, but that he made no attempt to determine their caliber. He testified that he did not know about Professor Nicol's procedure. He further testified that it would have been helpful to the defense to know that the bullets in Mr. Young and Ms. Polk were .22 caliber bullets.[2]

The trial court, noting that the accuracy of Professor Nicol's findings was somewhat suspect, denied Mr. Marshall's motion. Tr. of Sept. 16, 1981 at 73–78. Moreover, the court stated that, in its opinion, the jury probably would have rejected such evidence and that it would not have affect-

ed the outcome of the case. *Id.* at 79–80. The court held that Mr. Glasschroeder's representation had been adequate.

### C. *Appeals*

The Wisconsin Court of Appeals reversed Mr. Marshall's conviction on the ground that Mr. Johnson's testimony as to statements made by Elijah Jackson violated Mr. Marshall's sixth amendment right to confront the witnesses against him. *State v. Marshall*, No. 81–1798–CR, mem. op. at 4 (Wis.Ct.App. Sept. 10, 1982). The court said that adoptive admissions are not always reliable, and that Mr. Johnson's testimony was not trustworthy or reliable. Thus, under *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the confrontation clause barred their admission.

The Wisconsin Supreme Court reversed the decision of the Wisconsin Court of Appeals. *State v. Marshall*, 113 Wis.2d 643, 335 N.W.2d 612 (1983). The court held that the adoptive admission exception to the hearsay rule was a well-rooted hearsay exception, and therefore the confrontation clause did not bar its admission. Furthermore, the court held that Mr. Johnson's testimony had sufficient indicia of reliability to be admitted. *Id.* at 618.

On remand, the Wisconsin Court of Appeals considered the other issues raised in Mr. Marshall's appeal. The court declined to set aside the trial court's determination that Mr. Marshall had received effective assistance of counsel. *State v. Marshall*, No. 81–1798–CR, mem. op. at 8 (Wis.Ct. App. Oct. 10, 1983). Thus, his conviction was affirmed. Mr. Marshall's petition for review to the Supreme Court of Wisconsin was denied.

### D. *Petition for Writ of Habeas Corpus*

On January 28, 1985, Mr. Marshall filed a petition for writ of habeas corpus in the district court. R.1. Again, he alleged that he had been denied effective assistance of counsel based on an inadequate investiga-

---

**2.** Mr. Glasschroeder also testified that he was an alcoholic at the time of the trial and that he was taking an antidepressant drug. However, he testified that these conditions did not affect his representation of Mr. Marshall.

tion, and that the admission of certain parts of Mr. Johnson's testimony violated the confrontation clause. *Id.* at 5. Mr. Marshall alleged that he was "denied his right to due process and confrontation when an adoptive admission was admitted into evidence without a showing that it was trustworthy and reliable." *Id.*

The district court denied Mr. Marshall's petition on November 19, 1986. *Marshall v. Young,* No. 85–C–143, order (E.D.Wis. Nov. 19, 1986) [hereinafter Order]; R.11. The district court held that Mr. Marshall's trial counsel's decision to rely almost exclusively on a self-defense theory was reasonable, given the facts of the case. In arriving at this conclusion, the court noted that Mr. Marshall had told defense counsel that he fired a gun toward the back of the bar room. *Id.* at 7. In addition, Mr. Marshall said in a statement given to the police at the time of his arrest that he fired five or six shots to the back of the room and was " 'pretty sure he shot the woman and possibly shot the man.' " *Id.* Finally, the court noted that the self-defense theory was "consistent with the eyewitnesses' version of the shootings." *Id.*

In response to Mr. Marshall's confrontation clause challenge to the admission of Mr. Johnson's testimony, the district court held that Mr. Jackson's accusation that Mr. Marshall shot the wrong man would have caused Mr. Marshall to deny the statement if it were not true. Therefore, the circumstances guaranteed the trustworthiness of Mr. Johnson's testimony, and Mr. Marshall's confrontation rights were not violated. *Id.* at 12.

## II

### Discussion

#### A. *Ineffective Assistance of Counsel*

Mr. Marshall's ineffective assistance claim is based on his trial counsel's failure to investigate the caliber of the bullets in the bodies of Ms. Polk and Mr. Young. He claims that, by not conducting such an investigation, his trial counsel's performance was deficient under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80

L.Ed.2d 674 (1984). Moreover, if evidence had been presented at trial regarding the caliber of the bullets located in Ms. Polk and Mr. Young, he argues that there is a reasonable probability that he would have been acquitted of the attempted murder charges.

In *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, the Supreme Court established a two-part test for determining whether an attorney's assistance was so ineffective as to deprive a defendant of his sixth amendment right to counsel. A defendant must first establish that his counsel's performance was deficient (the "performance" component). He must also prove that he was prejudiced by that performance (the "prejudice" component). The Court stated:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.; see also United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1011–13 (7th Cir.1987).

We do not believe that the petitioner has met his burden under either of the two *Strickland* requirements. First, we agree with the district court that Mr. Marshall failed to show that his trial counsel's performance was "outside the wide range of professionally competent assistance." 466 U.S. at 690, 104 S.Ct. at 2066. As the Supreme Court said:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words,

counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.* In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. *And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.* In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Id.* at 690–91, 104 S.Ct. at 2066 (emphasis supplied).

■ Thus, the reasonableness of counsel's judgments regarding an investigation may depend significantly on the information provided by the defendant. Here, Mr. Marshall told his counsel that he had fired toward the back of the room during the shootout (i.e., where Mr. Young and Ms. Polk were hiding). And, in a statement given to police after his arrest, Mr. Marshall indicated that he had fired as many as five or six shots toward the back of the room in the direction of Mr. Young and Ms. Polk and that he was "pretty sure he shot the woman and possibly the man." Order at 7.

■ Given those facts, and the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, we certainly cannot say that counsel's performance even approached being constitutionally deficient. The "distorting effects of hindsight" always make it easy to find fault with a trial counsel's decisions. *Id.* at 689, 104 S.Ct. at 2065; *Sullivan v. Fairman,* 819 F.2d 1382, 1392 (7th Cir.1987). But the situation should be evaluated as it appeared to counsel at the time. Here, all of the eyewitnesses testified that Mr. Marshall fired a weapon toward the rear of the room. Mr. Marshall himself indicated that he had fired a weapon toward the rear of the room, and he believed that he had wounded at least one, if not both, of the attempted murder victims. Because of this evidence, it was reasonable for Mr. Marshall's trial counsel to focus his energies on developing the self-defense claim.

This case bears little resemblance to our recent decision in *Sullivan.* There, we ruled that a habeas petitioner had been denied counsel because his attorney had failed to interview five impartial witnesses who were at the scene of the crime and could have offered exculpatory testimony. However, we emphasized that satisfying the *Strickland* test is like passing through "the 'eye of the needle.'" 819 F.2d at 1391. We explicitly held "that trial defense counsel [need not] track down every lead or ... personally investigate every evidentiary possibility before choosing a defense and developing it." *Id.* at 1392.

Here, defense counsel was certainly not obliged to "track down every lead." On the basis of the information available to him at the time he made the decision, Mr. Glasschroeder pursued the obvious line of defense. His performance can hardly be characterized as constitutionally inadequate because he did not develop an approach which even the information supplied by his client indicated would be inadequate.

■ Even if Mr. Marshall could demonstrate that his counsel's performance was deficient, his petition would still fail because he has not shown the necessary level of prejudice. As was explicitly determined in *Strickland*, the test is whether "there is a reasonable probability that ... the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068. To establish the crime of attempted murder, the state was not required to show that Mr. Marshall shot Ms. Polk and Mr. Young. Under Wisconsin law, attempted first-degree murder requires proof of specific intent to take the life of another human being and an unequivocal act which, except for intervention of some extraneous factor, would have resulted in death. *State v. Cartagena*, 99 Wis.2d 657, 299 N.W.2d 872 (1981); *State v. Schenk*, 53 Wis.2d 327, 193 N.W.2d 26 (1972). Firing a weapon toward Mr. Young and Ms. Polk would satisfy the "unequivocal act" requirement—the element apparently contested by Mr. Marshall. *State v. Dix*, 86 Wis.2d 474, 273 N.W.2d 250, 254, *cert. denied*, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed. 2d 133 (1979). Several witnesses testified that Mr. Marshall fired his weapon in the direction of the victims. Indeed, Mr. Marshall so testified. Thus, even if the victims actually were shot by some other person, there was still ample evidence to support Mr. Marshall's attempted murder convictions.

## B. *Confrontation Clause*

Mr. Marshall asserts that his sixth amendment right to confront the witnesses against him was abridged by the admission into evidence of Mr. Johnson's testimony relating to the conversation between Mr. Marshall and Elijah Jackson. Mr. Johnson testified that Mr. Jackson told Mr. Marshall that he could not pay him $1,000 because he had killed someone other than Sonny Carter. Mr. Johnson claims that Mr. Marshall responded that he should be paid any-

way because he had risked his life in a furious gun battle. Mr. Marshall claims that there was no such conversation.

■ Hearsay testimony does not violate the confrontation clause if the prosecution can show 1) that the declarant was unavailable and 2) that the testimony bears adequate "indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). If the hearsay testimony falls within a "firmly rooted hearsay exception," then reliability can be inferred. *Id*. In this appeal, we need not determine whether the declarant was unavailable. At trial, the defendant did not contend that the out-of-court declarant was available, and the issue was not raised on appeal. Therefore, our analysis focuses on whether the alleged hearsay statement bears sufficient indicia of reliability.

The hearsay statement at issue was admitted under the adoptive admissions exception to the hearsay rule.[3] The trial court believed that this exception was applicable because Mr. Marshall did not deny that he was supposed to kill Mr. Carter when Mr. Jackson told Mr. Marshall that he could not pay him $1,000. The state respondents contend that the statement has adequate indicia of reliability because the adoptive admissions exception to the hearsay rule is allegedly a "firmly rooted hearsay exception."

Other circuits have said that the adoptive admissions exception is a firmly-rooted exception to the hearsay rule. *See Berrisford v. Wood*, 826 F.2d 747, 751 (8th Cir. 1987); *United States v. Monks*, 774 F.2d 945, 952 (9th Cir.1985). However, in this case, it is not necessary for us to decide whether, as a general proposition, the adoptive admissions exception is "firmly rooted." Because the hearsay statement at issue here was sufficiently reliable, independent of the status of the adoptive admissions exception, the petitioner's sixth amendment rights were not violated.

---

3. The adoptive admission exception applies when a party manifests the adoption or belief of a statement. *See* Fed.R.Evid. 801(d)(2)(B).

Adoption can be manifested by any appropriate means, such as language, conduct or silence.

The statements described by Mr. Johnson are highly consistent with the testimony of the other witnesses that were presented at trial, and even with the testimony of Mr. Marshall. Adolph Tates testified that he saw three men, including Mr. Marshall, surround Mr. Carter at the after-hours club, and that these men had their guns drawn. Mr. Marshall himself testified that they surrounded Mr. Carter and were taking him outside at gunpoint to beat him up. Mr. Marshall testified that the door was locked, and so he and Mr. Jones went into a room to try to find a key. In that room, however, were several people with guns, including Mr. Baxter and Mr. Young. The evidence clearly shows that a gun battle ensued in which Mr. Baxter was killed and Ms. Polk and Mr. Young were injured. Mr. Marshall and Mr. Jones then ran out of the room and left the building through a window.

This evidence corroborates Mr. Johnson's testimony that Elijah Jackson refused to pay Mr. Marshall because he shot the wrong man. Mr. Johnson's description of Mr. Marshall's response to Mr. Jackson is also consistent with the evidence. Mr. Jackson allegedly responded that he had risked his life and that there had been a gun battle. The evidence clearly shows that there was such a battle, and that Mr. Marshall was in the middle of it. Mr. Johnson's description of the conversation is therefore consistent with the testimony offered at trial. Thus, because of the substantial corroboration of Mr. Johnson's testimony, we are persuaded that the hearsay statements were supported by adequate "indicia of reliability." *Berrisford*, 826 F.2d at 750; *United States v. Feldman*, 761 F.2d 380, 387 (7th Cir.1985); *United States ex rel. Haywood v. Wolff*, 658 F.2d 455, 463 (7th Cir.), *cert. denied*, 454 U.S. 1088, 102 S.Ct. 649, 70 L.Ed.2d 625 (1981).

### Conclusion

Mr. Marshall was not denied his sixth amendment right to counsel merely because his attorney chose not to make ballistics tests. Nor were his sixth amendment rights abridged by the admission of hearsay testimony. Therefore, the decision of the district court is affirmed.

AFFIRMED.