**Gregory SMITH, Petitioner–Appellant,**

v.

**James W. FAIRMAN, Jr., Warden, Joliet Correctional Center, People of the State of Illinois, and Neil F. Hartigan, Attorney General of Illinois, Respondents–Appellees.**

No. 86–3018.

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1988.

Decided Nov. 9, 1988.

Peggy Healy, Law Student, Loyola Univ. Law School, Chicago, Ill., for petitioner-appellant.

Marcia L. Friedl, Office of Ill., Atty. Gen., Chicago, Ill., for respondents-appellees.

Before CUDAHY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

On May 4, 1982, following a jury trial in the Circuit Court of Cook County, Illinois, Gregory Smith was convicted of murder, attempted murder, home invasion, burglary, and armed violence. Mr. Smith appealed his conviction to the Illinois Appellate Court and that court affirmed the conviction in part.[1] *People v. Smith,* 127 Ill.App. 3d 622, 83 Ill.Dec. 27, 469 N.E.2d 634 (1984). The Supreme Court of Illinois denied Mr. Smith's petition for leave to ap-

peal on February 5, 1985. Mr. Smith then filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenged his conviction on the following grounds: 1) that the "death qualification" of prospective jurors pursuant to *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), violated his sixth amendment right to be represented by an impartial jury representing a fair cross-section of the community; 2) that the trial court erred in refusing to permit testimony that would have impeached the State's hearsay declarant, and that the error was not harmless; and 3) that the prosecutor's references during closing argument to Mr. Smith's failure to testify violated his fifth amendment privilege against self-incrimination. The district court denied Mr. Smith's petition for habeas relief in an unpublished order. For the reasons set forth in this opinion, we affirm the judgment of the district court.

I

Background

The Illinois Appellate Court summarized the facts underlying Mr. Smith's conviction. That rendition must serve as the basis of our review. *See Sumner v. Mata,* 449 U.S. 539, 545–46, 101 S.Ct. 764, 767–68, 66 L.Ed.2d 722 (1981). Accordingly, we set forth that account.

Regina Tatton resided in a two-story home at 7042 South Bell in Chicago. Tatton's niece, Marian Hyllen, and Hyllen's adult son, Edward Boyle, resided with Tatton. On the night of March 26, 1981, Tatton, Hyllen, and Boyle were asleep in their respective upstairs bedrooms; Boyle closest to the stairway, Tatton furthest from the stairs and Hyllen in between. At about 1:20 a.m. on March 27, Tatton was fatally stabbed by an intruder.

---

**1.** Mr. Smith's murder sentence was vacated and remanded for resentencing and his armed violence conviction was vacated.

    The Illinois Appellate Court vacated the conviction for armed violence because, as a matter of state law, it merged with the predicate felony. *People v. Smith,* 127 Ill.App.3d 622, 635, 83

Ill.Dec. 27, 38, 469 N.E.2d 634, 645 (Ill.App. 1st Dist.1984). Resentencing was required because, as a matter of state law, the defendant may select one of two sentencing alternatives when the sentencing alternatives available at the time of the offense differ from those available at the time of sentencing.

Hyllen testified that she woke up and started into Tatton's bedroom when she heard Tatton scream. Before she entered the bedroom, Hyllen saw Boyle run out of Tatton's room and down the stairway and she heard Boyle scream "Greg, you S.O.B." Hyllen entered Tatton's bedroom and again heard Boyle scream "Greg, you S.O.B." Boyle then came back upstairs to Tatton's room and said to Hyllen "that's okay, ma, I know where to get Greg."

Officer Stanley Wonsowicz and his partner arrived at Tatton's home at about 1:25 a.m. on March 27. Boyle met Wonsowicz at the door and Wonsowicz noticed that Boyle was bleeding. Boyle told the officer not to worry about him but rather [to] attend to his aunt who was upstairs. Officer Wonsowicz proceeded with Boyle up to Tatton's bedroom. The officer observed Tatton lying on her back while bleeding from her chest. Boyle was standing in the bedroom doorway. Over defense counsel's objection, Wonsowicz was permitted to testify that Boyle said "I can't believe Greg Smith did it." The officer then took Boyle downstairs to question him about the stabbing.

Once downstairs, Boyle told the officer that he was awakened by Tatton's scream and he went to his doorway where he saw Gregory Smith run out of Tatton's bedroom. Boyle told the officer that he fought with Smith and that Smith cut Boyle's back and finger. Boyle pointed to a pair of shoes lying on the kitchen floor and stated that they belonged to Smith. Wonsowicz also testified that Boyle said to him "why don't you get that sonofabitch [sic] Greg." Boyle stated that Smith had been wearing red pants and no shoes.

Edward Boyle died prior to Smith's trial.

The police subsequently went to Smith's home where his mother, Mrs. Henrietta Smith, permitted them to search. No evidence was discovered. Defendant was subsequently arrested and taken to the police station for questioning. Initially, Smith said he did not know anything about Regina Tatton's death. When Officer James Higgins told Smith that Boyle had seen Smith come out of Tatton's home, Smith said that he had been there but only as a lookout. Higgins then told Smith that Boyle said that he had struggled with Smith and Smith responded that he had not gone upstairs and that Johnny Tuck had planned everything. At this point, the police stopped questioning Smith and sought to locate Tuck.

Johnny Tuck testified that on March 26 at 4:30 p.m., he was smoking marijuana and drinking wine in front of his house with Gregory Smith. Tuck testified that Smith said he had a key to Edward Boyle's house and knew where some old coins were. Smith asked Tuck to go with him to Boyle's house but Tuck refused.

Tuck admitted having fought with Smith on several earlier occasions. There was also evidence that Tuck had assaulted one of Smith's sisters and that Mrs. Smith had filed a criminal complaint against Tuck.

After talking with Tuck, an assistant State's Attorney spoke with Smith and told him that Tuck was not verifying Smith's story. Smith then confessed to stabbing Tatton. He said he was out of work and needed money and knew that Tatton kept money in a purse next to her bed.

Lawrence Hale and his mother Rosemary testified in Smith's defense. They testified that Smith slept at their home on the night of March 26/27 and that at the time Regina Tatton was stabbed, Smith was watching television with Lawrence.

Henrietta Smith also testified in her son's defense. Defense counsel attempted to elicit from her the substance of a conversation she had with Edward Boyle after Regina Tatton's death. The State objected to this line of questioning on hearsay grounds and a sidebar conference ensued. In the conference, defense counsel stated that if allowed to testify, Mrs. Smith would [have] stated that Edward Boyle said that he did not know

who he saw coming out of Tatton's room. Defense counsel also stated that Mrs. Smith had a tape recording of Boyle's statement. The court sustained the State's hearsay objection and prevented defense counsel from questioning Mrs. Smith concerning the tape.

*Smith,* 127 Ill.App.3d at 624–26, 83 Ill.Dec. at 30–31, 469 N.E.2d at 637–38.

## II

### Analysis

**A. *Sixth Amendment Jury Representation Issues***

Because Mr. Smith was accused of committing a murder during the course of a burglary, he faced a potential penalty of death. *See* Ill.Rev.Stat. ch. 38 § 9–1(b)(6) (West 1979). Accordingly, during the voir dire of potential jurors in Mr. Smith's trial, those jurors who expressed an inability to set aside their strong opposition to the death penalty were excluded for cause. *See Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). As a result of the death-qualification procedures, eleven potential jurors were excluded for cause.

1. Challenges to "*Witherspoon* excludable" Jurors

■ Mr. Smith argues that the prosecutor's challenges for cause of potential jurors opposed to the death penalty violated his right to an impartial jury representing a fair cross-section of the community. Although this is the only sixth amendment jury representation issue that is properly before this court by virtue of Mr. Smith's having raised it in both the Illinois Appellate Court and in the district court below, this challenge is nonetheless foreclosed by the Supreme Court's decision in *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). In *McCree,* the Supreme Court held that the death qualification of jurors pursuant to *Witherspoon* does not violate the sixth amendment's fair cross-section requirement. The Court reasoned that, even if it were to extend the fair cross-section requirement to the petit jury (which it declined to do), "*Wither-*

*spoon*–excludable" jurors, being defined solely in terms of shared attitudes, do not constitute a "distinctive group" for purposes of fair cross-section analysis. *McCree,* 476 U.S. at 174–77, 106 S.Ct. at 1765–67. *McCree* further held that death qualification does not violate a defendant's right to an impartial jury; a defendant has no right to a jury representing a hypothetical mix of certain viewpoints. "[A]n impartial *jury* consists of nothing more than '*jurors* who will conscientiously apply the law and find the facts.'" *Id.* at 178, 106 S.Ct. at 1767 (quoting *Wainwright v. Witt,* 469 U.S. 412, 423, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985)). Thus, we conclude that the death qualification of Mr. Smith's jury did not violate the sixth amendment and he is therefore not entitled to habeas relief on this ground.

2. Prosecution's Peremptory Challenges to Other Jurors

■ On appeal, Mr. Smith, who is now represented by appointed counsel, also argues that he was deprived of his sixth amendment right to trial by an impartial jury and a jury representing the possibility of a fair cross-section of the community. This claim is based on the prosecution's use of peremptory challenges to exclude: 1) jurors who expressed reservations about the death penalty but who were not otherwise "*Witherspoon*–excludable"; 2) black jurors; and 3) white jurors who had significant contacts with blacks. We note, however, that, though Mr. Smith's habeas petition addressed the prosecutor's challenges for cause of "*Witherspoon*–excludable" jurors, the remainder of these sixth amendment issues are being presented for the first time before this court. Because Mr. Smith was proceeding *pro se* in the district court, his petition must be given a liberal construction under the mandate of *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). However, even construing his petition liberally, we cannot conclude that Mr. Smith raised any sixth amendment argument other than the contention that the exclusion *for cause* of those opposed to the death penalty violated

his right to an impartial jury representing a fair cross-section of the community. *See Sotelo v. Indiana State Prison*, 850 F.2d 1244, 1252 (7th Cir.1988) (habeas petitioner did not properly preserve ineffective assistance of counsel claim based on failure to object to certain evidence by raising earlier ineffective assistance claim based upon manner of conducting insanity defense). The death qualification issue that was properly raised rests on a wholly different underlying factual basis for challenging the jury's composition. It is based upon the prosecution's right to challenge for cause, rather than its ability to exercise peremptory challenges, and concerns the exclusion of a group of jurors wholly distinct from those groups allegedly excluded by peremptory challenges. Because Mr. Smith did not even remotely address the prosecution's exercise of its peremptory challenges to exclude the above-mentioned groups of potential jurors in his petition in the district court, none of these issues are properly before us on appeal. *Phegley v. Greer*, 691 F.2d 306, 310 (7th Cir.), *cert. denied*, 459 U.S. 946, 103 S.Ct. 262, 74 L.Ed.2d 204 (1982) (issue not even remotely implicit in arguments raised by *pro se* petitioner in district court could not be presented for first time by appointed counsel on appeal).

## B. *Equal Protection Clause Challenge*

■ Mr. Smith also argues that the prosecutor's use of peremptory challenges to strike blacks from the jury violated the equal protection clause of the fourteenth amendment and requires remand for an evidentiary hearing under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986). Even assuming that this claim is properly before us, Mr. Smith is nonetheless foreclosed from relief under *Batson* because that decision does not apply retroactively to cases on collateral review of a conviction that became final before *Batson* was decided. *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). Since Mr. Smith's conviction became final more than one year before the decision in *Batson*, that decision does not provide him with a basis for relief.

## C. *Improper Admission and Exclusion of Hearsay Testimony*

Mr. Smith next contends that three improper evidentiary rulings by the trial judge resulted in violations of his right to confrontation. First, Mr. Smith challenges the trial court's decision to permit Officer Wonsowicz to testify that, while standing in the bedroom doorway and observing his wounded aunt, Boyle stated, "I can't believe Greg Smith did it." The second category of hearsay statements that were admitted over Mr. Smith's objection were statements made by Boyle to Officer Wonsowicz after the officer had taken him downstairs to the kitchen for questioning. Once in the kitchen, Boyle told the officer that upon being awakened by his aunt's scream, he ran into the hallway and saw Greg Smith running out of his aunt's bedroom. Boyle said that he fought with Mr. Smith and that Mr. Smith stabbed him in the back and finger during the scuffle. Boyle indicated that a pair of shoes lying on the kitchen floor belonged to Mr. Smith and that when he saw him, Mr. Smith was wearing red pants and no shoes. He asked Officer Wonsowicz, "why don't you get that sonofabitch [sic] Greg." Finally, Mr. Smith challenges the trial court's refusal to permit Mr. Smith's mother to testify to prior inconsistent statements that Boyle had made to her, statements that Mrs. Smith had tape-recorded, in which Boyle stated that he wasn't sure who he had seen on the night of the murder.

### 1. Spontaneous Declarations

■ Mr. Smith first claims that the admission of Boyle's hearsay statement to Officer Wonsowicz while standing in the doorway of his aunt's bedroom violated his sixth amendment right to confront the witnesses against him. We have held that "hearsay testimony does not violate the confrontation clause if the prosecution can show 1) that the declarant was unavailable and 2) that the testimony bears adequate 'indicia of reliability.'" *Marshall v. Young*, 833 F.2d 709, 716 (7th Cir.1987) (quoting *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)).

Mr. Smith does not deny that the first prong of this test was met—Boyle clearly was unavailable because of his death prior to trial. With regard to the second prong, we have held that where hearsay testimony falls within a "firmly rooted exception" to the hearsay rule, its reliability can be inferred. *Id.* Both the Illinois Appellate Court and the district court held that Boyle's statement fell within the hearsay exception for "spontaneous declarations." We agree.

The Illinois Appellate Court explained that, in order to fall within the spontaneous declaration exception to the hearsay rule, a statement must "(1) be made in response to an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) be made without time to fabricate; and (3) relate to the circumstances of the occurrence." *Smith*, 127 Ill.App.3d at 627, 83 Ill.Dec. at 32, 469 N.E.2d at 639 (citing *People v. Poland*, 22 Ill.2d 175, 181, 174 N.E.2d 804, 807 (1961)). Mr. Smith argues that the challenged statement does not fall within this exception because it was not made in reaction to a "startling event." He claims that Boyle had already been in his aunt's room once before the police arrived. As the Illinois Appellate Court pointed out, however, the evidence suggested that Boyle first got a good look at his aunt, bleeding profusely from her chest, when he accompanied the officer to the door of her room. Even assuming, however, that Boyle had already seen his aunt five minutes earlier, we do not think that viewing a close relative bleeding from stab wounds would be any less startling the second time around.

Mr. Smith also argues that Boyle's statement does not qualify as a spontaneous declaration because the amount of time that had elapsed between the incident and the officer's arrival was too great. While a lapse in time between the event and the statement may be relevant to determining whether the statement is a spontaneous declaration, the time element alone is not controlling on the issue. *Gross v. Greer*, 773 F.2d 116, 120 (7th Cir.1985). All that the exception requires is "that the statement be made contemporaneously with the excitement resulting from the event, not necessarily with the event itself." *United States v. Moore*, 791 F.2d 566, 572 n. 4 (7th Cir.1986). Here, Boyle's statement was made just five minutes after he had discovered Mr. Smith in the house and struggled with him. Officer Wonsowicz testified that when Boyle met him at the front door, he was bleeding from his finger and his back and appeared to be in great pain. Physical factors such as pain may serve to prolong the period in which the risk of fabrication is reduced to an acceptable minimum. *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1058 (6th Cir.1983), *cert. denied*, 464 U.S. 1071, 104 S.Ct. 980, 79 L.Ed.2d 217 (1984) (quoting 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(2)[01] at 803–05 (1981)). Because we believe that Boyle's statement clearly fell within the spontaneous declaration exception to the hearsay rule, it was reliable and its admission did not violate Mr. Smith's rights under the confrontation clause.

## 2. Kitchen Statements

█ Mr. Smith next contends that Boyle's statements to Officer Wonsowicz in the kitchen were hearsay and that their admission violated his right to confrontation. The Illinois Appellate Court held that these statements, unlike the statement he made while standing in the bedroom door, were not spontaneous declarations and that their admission in evidence was therefore error. We agree with the Appellate Court that these later statements did not constitute spontaneous declarations, because the circumstances under which they were made showed that Boyle would have had time to reflect on the events that had occurred and organize them in his mind before describing them to Officer Wonsowicz. *Smith*, 127 Ill.App.3d at 626–27, 83 Ill.Dec. at 32, 469 N.E.2d at 640. Nevertheless, the admission of those statements did not violate Mr. Smith's right to confrontation if they were supported by other "indicia of reliability." *Marshall*, 833 F.2d at 716. In fact, every detail of Boyle's kitchen statements was corroborated by other evidence admitted at trial. Boyle's identification of Mr.

Smith as the perpetrator was supported by Boyle's earlier statement to his mother (the admissibility of which Mr. Smith does not challenge), in which he told her, "that's ok, ma, I know where to get Greg." The identification of Mr. Smith was also supported by Boyle's earlier spontaneous declaration to Officer Wonsowicz, by Tuck's testimony that Mr. Smith told him of his plan to rob Ms. Tatton, and, not least of all, by Mr. Smith's own confession. Boyle's statement that Mr. Smith had been wearing red pants and no shoes, and that a pair of size 9½ black shoes near the kitchen door belonged to Mr. Smith was also corroborated by other testimony. Tuck testified that when he saw Mr. Smith just one and a half hours before the incident, he was wearing red pants and black shoes. Mr. Smith also described in his confession to Assistant State's Attorney Sherwin how he had left his shoes by the kitchen door so that he would not make any noise. Finally, though Mr. Smith did not mention his struggle with Boyle when making his confession, the testimony of Officer Wonsowicz and Boyle's mother, corroborated by the medical evidence, all established that Boyle had been in a fight and had been stabbed in the finger and back during the struggle. Thus, we hold that the kitchen statements were supported adequately by other indicia of reliability and their admission did not violate Mr. Smith's sixth amendment right to confrontation.

### 3. Exclusion of Boyle's Prior Inconsistent Statement

The trial court refused to permit Mrs. Smith to testify that, prior to his death, Boyle told her that he was not sure who he had seen on the night of the murder. The Illinois Appellate Court held that ruling was error because, "[w]here a statement of an absent declarant is properly admitted into evidence under one of the hearsay exceptions, the opposing party may impeach such statement with a prior inconsistent statement by the declarant." *Smith*, 127 Ill.App.3d at 630, 83 Ill.Dec. at 35, 469 N.E.2d at 641. *See also* Fed.R. Evid. 806 ("When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.")

The State contends that Mrs. Smith's testimony as to Boyle's inconsistent statement was not admissible because defense counsel did not establish one of the foundational requirements for its admission—that Boyle had been given an opportunity to explain its significance prior to his death. In so arguing, the State relies on the Supreme Court's decision in *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895). There the Court held that the defendant was required to lay such a foundation to impeach the former trial testimony of a deceased witness. *Mattox*, however, involved the admission of hearsay in the form of prior trial testimony that the defendant had once had an opportunity to cross-examine. The Supreme Court later held in *Carver v. United States*, 164 U.S. 694, 17 S.Ct. 228, 41 L.Ed. 602 (1897), that the foundational requirement that a hearsay declarant be given an opportunity to explain another inconsistent statement did not apply where the hearsay statement admitted was a dying declaration, rather than prior trial testimony. *Id.* at 698, 17 S.Ct. at 230. The Court stated that it was not inclined to extend the foundational requirement of *Mattox* "where the defendant has had no opportunity by cross-examination to show that by reason of mental or physical weakness, or actual hostility felt towards him, the deceased may have been mistaken." *Id.* The Ninth Circuit reached a similar conclusion in *McConney v. United States*, 421 F.2d 248 (9th Cir.1969), *cert. denied*, 400 U.S. 821, 91 S.Ct. 39, 27 L.Ed. 2d 49 (1970), where, relying on *Carver*, it held:

> While the general rule is that a witness may be impeached by his prior inconsistent statements only after a proper foundation has been laid by inquiring as to whether he made the prior inconsistent statements, that rule has been dispensed with in situations where the witness is unavailable and hearsay evidence is of-

fered to impeach the previously admitted hearsay evidence of the statements of the absent witness.

421 F.2d at 251. The drafters of Federal Rule of Evidence 806 specifically dispensed with this foundational requirement in drafting Rule 806, which provides that, "[e]vidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain." Fed.R.Evid. 806.

■ We conclude that defense counsel was not required to show that Boyle was given an opportunity to explain his prior inconsistent statements before introducing Mrs. Smith's testimony regarding those statements into evidence. Because Boyle was deceased, and because Mr. Smith was never given the opportunity to cross-examine Boyle regarding his hearsay statements to Officer Wonsowicz, this foundational requirement does not apply. It was therefore error for the trial court to exclude Mrs. Smith's testimony regarding the prior inconsistent statements.

■ We also believe that this error did violate Mr. Smith's right to confrontation under the sixth amendment. The refusal to permit this impeaching testimony is analogous to a situation where a trial court limits a defendant's attempt to cross-examine a witness on a key issue of credibility. In *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Supreme Court held that:

> [A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of witnesses."

*Id.* at 680, 106 S.Ct. at 1436 (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)). We think that, under the circumstances presented here, prior inconsistent statements of a hearsay declarant similarly constitute a "prototypical form" of impeachment. Mrs. Smith's testimony regarding Boyle's contradictory statements about the identity of the intruder were analogous to "otherwise appropriate cross-examination" designed to place in question the credibility of an unavailable hearsay declarant. If Mr. Smith had available to him comparable means by which to undermine the reliability of Boyle's hearsay declarations, perhaps we would hesitate to find a violation of the right to confrontation. *See United States v. Dempewolf*, 817 F.2d 1318, 1321 (8th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987) (no error in limiting cross-examination on issue of prior inconsistent statement where jury was aware of, among other things, witness' other prior inconsistent statements); *Nance v. Fairman*, 707 F.2d 936, 942 & n. 7 (7th Cir.1983) (same). Here, however, Mr. Smith had no alternative means of attacking Boyle's credibility with regard to his identification of Mr. Smith as the perpetrator, primarily because Boyle was unavailable for cross-examination on issues such as his ability to observe or possible bias against the defendant. The trial court's exclusion of the prior inconsistent statement therefore deprived Mr. Smith of his only chance to place before the jury a legitimate question as to the truth of Boyle's hearsay declarations, *Nance*, 707 F.2d at 942, and violated his right to confront the witnesses against him. Given the admission of all of Boyle's hearsay kitchen statements, the trial court should have permitted this impeaching testimony.

■ Although we believe that the exclusion of Mrs. Smith's testimony did amount to constitutional error, that error is nevertheless subject to review under the harmless error doctrine. *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438. Thus, we must determine what effect the error may have had on the fact-finding process at trial. *Id.* In evaluating whether an error is harmless, we do not engage in a simple review of all of the evidence, but instead we attempt to "assess, as precisely as we can, the impact of the objectionable material on the jury's

verdict." *Fencl v. Abrahamson,* 841 F.2d 760, 769 (7th Cir.1988). In this case, we believe that the evidence of Mr. Smith's guilt was overwhelming, not least of all because he confessed to the crime in a detailed confession, the validity of which he does not challenge here. Mr. Smith told Assistant State's Attorney Sherwin his motive for the crime and detailed the events that had taken place in Ms. Tatton's home that night, including the fact that he had removed his size 9½ shoes in the kitchen and had fled the scene without them. Tuck's testimony also corroborated Mr. Smith's confession and Boyle's hearsay statements as to what Mr. Smith had been wearing on the night of the burglary and murder. Finally, the physical evidence regarding the trail of blood in the alley leading from Ms. Tatton's house to Mr. Smith's house was particularly devastating, considering that, when the police found him the next day, he was bleeding from a cut on his finger and had to· be taken to a hospital emergency room. In light of all of this evidence, we do not think that the admission of Mrs. Smith's testimony that Boyle once told her, in a drunken state, that he was not certain who he had seen on the night of the murder, would have affected the jury's verdict. Even absent the hearsay testimony regarding Boyle's identification of Mr. Smith, which Mrs. Smith's testimony was primarily designed to impeach, the evidence of Mr. Smith's guilt was overwhelming. The erroneous exclusion of that testimony was therefore harmless beyond a reasonable doubt.

D. *Prosecutor's Closing Argument*

■ During his closing argument, defense counsel volunteered the following remarks regarding Mr. Smith's failure to testify in his own behalf:

Gregory Smith's testimony was not his own. There is no mystery, it is no new thing that people force confessions. Due to his condition, he wasn't able to come forward with his own story and tell you his story through his own mouth but you ladies and gentlemen must utilize not only your experiences in life but your own common sense that a man who is an Assistant State's Attorney will tear up one set of notes, set it in another longhand fashion another set of notes and then type up some other notes and never, ever shows them to the individual, who supposedly says it for the purpose of verifying whether it is accurate.

Tr. at 610–11. During his rebuttal argument the prosecutor then made the following comments:

PROSECUTOR: At the very end of his argument he says Gregory Smith could not tell you out of his own mouth because of his condition. What condition? Gregory Smith did not testify in this case, his choice; but it was not because of any condition. He did not testify because he could not stand up under cross-examination.

DEFENSE COUNSEL: Objection to that.

THE COURT: Overruled.

PROSECUTOR: Because he is a murderer.

DEFENSE COUNSEL: Objection.

PROSECUTOR: He already once said—

DEFENSE COUNSEL: Objection to these continual prejudicial remarks which are unfounded.

THE COURT: Overruled.

PROSECUTOR: He already once said what occurred. He told Assistant State's Attorney Sherwin and two police officers. Gregory Smith was afraid to get up there and see what would happen if questions were asked.

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

PROSECUTOR: Mr. Draper gave you an explanation as to why he didn't testify. That is the explanation, he could not testify because he would have to lie and he would get caught.

DEFENSE COUNSEL: Objection, Judge.

THE COURT: Overruled.

Tr. at 617–19.

Both the Illinois Appellate Court and the district court held that defense counsel's reference in his closing argument to Mr. Smith's "condition" had justified the prose-

cutor's reply that Mr. Smith had not testified "because he could not stand up under cross-examination," "because he is a murderer," and "because he would have to lie and he would get caught." In a recent case, the Supreme Court held that a prosecutor's comment on a defendant's failure to testify does not violate the fifth amendment where that comment is a fair response to argument by defense counsel. *United States v. Robinson*, — U.S. —, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988). In *Robinson*, defense counsel repeatedly argued in closing that the defendant had not been given a chance to explain his side of the story. Following defense counsel's closing argument, the prosecutor objected to these remarks outside the presence of the jury and asked the court for permission to respond in kind, contending that defense counsel had "opened the door." The court agreed with the prosecutor, and in his rebuttal summation the prosecutor stated, "[the defendant] could have taken the stand and explained it to you, anything he wanted to. The United States of America has given him, throughout, the opportunity to explain." *Id.* 108 S.Ct. at 866–67. The Court held that, in light of defense counsel's argument, the prosecutor's comments were a fair response, because "the prosecutorial comment did not treat the defendant's silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was afforded, contrary to the statement of his counsel, to explain his side of the story." *Id.* at 869.

■ We believe, however, that the State's comments in this case are a far cry from the restrained rebuttal sanctioned by the Court in *Robinson*. Although defense counsel did invite some comment on the reason that Mr. Smith had not testified in his own behalf, that invitation was followed by an overreaction by the prosecutor. He not only suggested to the jury that Mr. Smith's silence was substantive evidence of his guilt but practically commanded the jury to reach such a conclusion. A prosecutor may never treat a defendant's silence as substantive evidence of guilt. *Id.; United States v. Sblendorio*, 830 F.2d

1382, 1391 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988). We therefore hold that the prosecutor's comments in this case violated Mr. Smith's fifth amendment right against self-incrimination.

■ This error is nevertheless subject to review under the harmless error doctrine. The question this court must ask is whether, absent the prosecutor's comments equating Mr. Smith's failure to testify with substantive evidence of guilt, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty. *United States v. Hasting*, 461 U.S. 499, 511, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983); *United States v. Wilkins*, 659 F.2d 769, 774 (7th Cir.), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981). As we previously discussed in addressing the violation of Mr. Smith's right to confrontation, the evidence against him was overwhelming, not least of all because of the admission in evidence of his confession and the corroborating testimony of Johnny Tuck. Therefore, though we believe that the prosecutor's comments were constitutional error, we are convinced beyond a reasonable doubt that Mr. Smith would have been convicted even in their absence.

### III

### Conclusion

The death qualification of Mr. Smith's jury did not violate the sixth amendment. Mr. Smith's sixth amendment claims regarding the prosecutor's use of peremptory challenges are not properly before this court, and his *Batson* claim is foreclosed on collateral review. Although the trial court's refusal to admit the impeaching testimony of the defendant's mother violated his right to confrontation, that error was harmless beyond a reasonable doubt. Further, though the prosecutor's comments on the defendant's failure to testify violated his rights under the fifth amendment, that error was also harmless beyond a reasonable doubt. For the foregoing reasons, the district court's judgment denying Mr.

Smith's petition for a writ of habeas corpus is affirmed.

AFFIRMED.